We are ready to hear the second case on the calendar for this afternoon. United States v. Cooper. Do you want me to try to step out? I know what both of them look like. I will. Thank you. Thank you, Troy. Push it in. Thank you so much. What are we waiting for? What's going on? My apologies. Thank you. I could have been clearer. We would take a very brief recess. My apologies to the court. Counsel was able to locate me promptly. My name is Frank Bogulski, and I represent Deontay Cooper, the appellant, in this matter. We filed an appeal on several grounds. The first I was going to address was Rule 29 motion that I had filed to dismiss the case for lack of evidence. In reviewing the trial, and I did the trial myself, and I questioned all the witnesses, the court acknowledged that there was really no direct evidence regarding Mr. Cooper's alleged participation in a conspiracy to distribute firearms. He lived in Ohio, Mr. Cooper, and never went to Buffalo. So the allegation was that Mr. Williams was transporting guns to Buffalo. Mr. Cooper never purchased any firearms. He never sold any firearms. He was a drug dealer, admittedly. Wasn't the evidence that he was recruiting straw purchasers? That was what the government's evidence was that he was recruiting them. My argument to the court is rather narrow in the sense that Mr. Cooper, unfortunately, was involved in selling drugs. He acknowledged that. He had pled guilty in state court. These were his customers, and he was selling drugs to them regardless, and it had really nothing to do with the firearms conspiracy. He did have a cousin, Mr. Williams, and that's basically what the government's argument was, is that he was recruiting them. But Mr. Williams met the straw purchasers, and they were met at Runkle Avenue, where my client had lived. But it wasn't – our argument wasn't directly involved with that, that he was selling drugs independently of that. Where is Runkle Avenue?  Where is Runkle Avenue? Oh, I'm sorry, Ashtabula, Ohio. That was the house in question. Just which side of the line was what I was interested in. Sure, yes, in Ashtabula. That was the house of my client. So our argument is narrow in a sense because – and I did, you know, through the trial, I went through all the witnesses. Some of them couldn't even identify my client. There was Leonard Hofsetter, his wife, Vicki Hofsetter, could not ID my client in the courtroom. Cori Runyon, she was a witness called to testify at trial. She said she knew my client from high school. Jenna Redding testified she never met Cooper. The main witnesses against him were Victoria Orlando and Mr. Williams. And Victoria Orlando testified at trial that the agreement to purchase firearms with Mr. Williams was when they were in a car traveling to a craft show. That's when they hatched their agreement, and she testified to that. So my argument is rather narrow, and now I would like to focus on the COVID-19 issue. Our argument here is that the judge, the trial judge, should have allowed us to question the jurors about whether the COVID pandemic, the beginning of it, impacted their deliberations.  Did you ask to ask those questions? I'd ask to, not those specific questions, Your Honor. I'd ask the judge if I could talk to the jurors about what their deliberations were. And recently I tried, or maybe a year ago, I tried a case before Judge Villardo, and fortunately I won that case, so I don't have to be here. But he allowed me to ask questions of the jurors. It's in the trial court's discretion. Specifically with respect to COVID? I did not. I don't remember asking. I asked if I could- Not COVID. I don't recall it being on COVID, Your Honor. No, you didn't bring up that issue. I did not bring up that issue until after the fact, when I filed the Rule 33 motion. Because hindsight's always 20-20, and what I was asking for was a very narrow, not about necessarily, you know, what did you think of this witness, what did you think of that witness? I just wanted to ask the jurors if the COVID pandemic impacted their deliberations. I remember being a little nervous about it. I think everyone was. I remember walking in the courthouse, and they had questionnaires, and they had already, by the last day of deliberations, reduced the capacity of the courthouse to 50%. I remember going to lunch and getting paper menus. So what I wanted to know, because I remember looking at the jurors, and I thought some were on our side. You know, they come in, and their arms are folded like this, and you're wondering, and I wanted to ask them, did this impact you? Did you rush through the verdict in any way based on any fear for your health? But to answer your question, I did not raise that specific issue until after the fact, Your Honor. And in terms of the record, I mean, the jury sent multiple notes to the district court. They asked for readbacks. At some point, they requested a smoke break. There's nothing that helped me if I'm missing something in the transcript, nothing in the transcript that suggests any reason for concern that the jury was rushing through. But there's, I mean, I did, you know, I was reading counsel's brief in preparation, obviously, and I, you know, she did a good job pointing those issues out. But we're left not to know. You know, what I think we were requesting was pretty reasonable, that given the impact of the pandemic, that we could have maybe sent a questionnaire to a letter and said, hey, you know, do you think that this impacted you in any way? And so what we thought we would know for sure, because honestly, we don't know, standing here right now, if there was one juror, all it takes is one holdout that, you know, was worried about their children or a loved one or getting exposed to COVID. I mean, there were scary times. And I thought by making that request, it was pretty reasonable. It could have been done pretty quickly. And then we would know. And if the jurors said, hey, you know what, and they had nothing to do with it. If we believe the government's witnesses, then, you know, I mean, I still think about it candidly. You know, when you look at any trial that you do or any job you do, you look back and you wonder, you know, did these jurors get impacted by this? And they may have and honestly don't really know. So what we're asking. But as I know, I keep thinking about your saying that hindsight is always 20-20. I don't know how many cases, appeals are lost in this courtroom every week because hindsight is 20-20. I mean, you got to bring it up at a time when the judge can respond to it, not when he can look back on it and say, gee. Sure. Well, we did. I mean, arguably, we did preserve it in a sense that I asked if I could talk to the jurors about the deliberations. But I did. But I wanted to be candid with you. I don't want to say that I mentioned it. But I did ask. And someone may have said that. They may have said we don't want to talk to you, you know. But those are our arguments at this point. And I appreciate the opportunity to be here to make the case for Mr. Cooper, who remains in custody at this time. Good afternoon, your honors. May it please the court. I'm Stephen Metcalf. I represent Titus Thompson. Mr. Thompson's case stands for a little bit more of a different premise here. And it goes to, sorry, I'm just going to move one of these microphones. It goes to show and establish just how important the foundation is. Foundation is always important. And when the foundation is cracked, so is everything else that goes on top of it. And if the foundation is cracked, it goes to show how everything on top of it can also be tainted. So what am I getting to? I'm getting to the day of May 18, 2018. That is the day that Titus Thompson became, for the first time, a suspect in this case. Prior to May 18, there was a federal investigation conducted by the ATF that solely targeted Williams. You just heard my colleague mention the testimony of Mr. Williams. ATF conducted this investigation for approximately six months. And just two days before May 18, got a federal judge to sign a warrant to search Mr. Williams' house. So then, two days later, on May 18, sure enough, 6 a.m., the search begins. By 8.30, Mr. Williams is in a federal building being questioned. By 10.30, and I actually gave a timeline in my first argument that I believe starts on page 31, I give a timeline of this specific breakdown. By 8.30, Williams began questions. At approximately 10 a.m., after all the allegations were documented, there was a plan to get a search warrant for Mr. Thompson, Titus Thompson. By 11.30, Mr. Williams was in a suit getting transported to a courthouse. But it wasn't the same courthouse that signed the affidavit for a search warrant for Mr. Williams just two days before. ATF was actually very strategic in how they went about this going from here. They couldn't go back to that same judge and say, Remember the target two days ago that you signed the search warrant on? Yeah, now he's a reliable, credible informant for us. When did you search his house? Just a couple hours ago. So what they choose to do is they went across the street to a different judge. They went to a state courthouse. They went to a state courthouse to obtain the search warrant based on probable cause for Mr. Thompson. That was Judge Mikulski? Yes. And they got in. I hate to ask this, but there's a tragic story about him shortly thereafter. I assume that there's no intersection between that story. No, Your Honor, and I'm surprised I did not hear about that because about a year later he testified on this case. That's one of the reasons I'm asking. It was, yeah, you can Google like I can Google. Yes, I'm going to have to do that. I did not know that. Thank you, Your Honor. So then in addition to his involvement, an ADA was also involved in helping facilitate the process that happened that morning. So now Mr. Williams is in the hallway with the suit on approximately four or five hours or so after he was just arrested. Now, Mr. Williams, let's back up a little bit. On the morning of May 18th, Mr. Williams already had two felonies. He had a house full of guns, a house full of different ammunition. I mean, the reports go on and on about what was obtained in his household that day. When he's put in the room and questioned, he actually starts breaking down crying about the thought of not being able to see his children. So what does he do? He does something actually miraculous. He pulls out the name Titus. The name, one name, changed the whole scope of every single thing in the course of this investigation. So the name Titus then becomes the main focal point of what these officers are looking at. Your time is running. Yes. So let me just direct you to I think the argument in the brief, and you can help me understand it. So all of this goes to whether there was probable cause in the warrant application, and can you explain to me why there was not? Okay, so the words, and it also does kind of transition into point two, which has to do with the search warrant being overly broad as well. So going back to point one, which Your Honor just addressed, it goes to a lot of different things. First off, Mr. Williams was deemed a reliable, credible source numerous times throughout the application. I counted three or four on one single page. Then he dressed up in his suit and led to believe or had the court believe that he was reliable and credible. So I ask Your Honors to consider this. Consider how much those words have meaning. They have meaning to the FBI. They have meaning to the courts. It goes to the Illinois v. Gates factors, and I touched on this on page 16. And there's different standards and there's different factors that you consider in determining whether or not an informant is in fact reliable or credible or could be deemed such. And simply submitted here, all three of those factors, there was not enough time for them to simply be able to establish that Mr. Williams was reliable, that he was credible, that he in any way, shape, or form could have been deemed or classified as any of those. Because if this judge did ask more about it and there were specific questions during that hearing, did he know that he was a target on another investigation just days before? The judge did not know that. Did he know that he was involved in various different accusations regarding drugs and guns? No, he did not know that. Did he know that he was just picked up that warrant? Well, he was informed according to the testimony before the district court when he appeared before the state court judge. And the state court judge was informed that he had a history with Thompson, that he had purchased cocaine from Thompson in the past 10 days. So his basis of knowledge was presented to the court. And the fact that he was involved in criminal activity, he had purchased cocaine presented to the court. So the question now is whether there was enough of a substantial basis for that warrant to issue, which is a big hurdle for you to overcome. Understood. And that's where I ask your honors to take a look at the trial transcript of Mr. Williams. Mr. Williams actually contradicts those statements from ever being made by him. He said in no way, shape, or form did he ever see or have seven different drug dealings with Mr. Thompson. That's not the case. His trial testimony actually contradicts everything in the search warrant that was provided to the state court judge as a basis for this affidavit and this probable cause. He actually says that he saw one time a powdery substance in a bag. He does not say that he could actually identify it as cocaine or that he purchased this from Mr. Thompson at all. And that's where it also blends into the second argument about the scope. He goes to the top floor, this building, two-family dwelling. It's separated with apartments. They go, according to Mr. Williams, he goes with Mr. Thompson to the upstairs apartment. Never to the downstairs apartment, which is relevant and crucial here because that is where Mr. Thompson's aunt and uncle live. And that's where the search should have stopped at that time upon the officers discovering that fact. But they continued to go past their search. But didn't they find guns in the aunt and uncle's apartment? They did find guns, Your Honor, in the aunt and uncle's apartment. They found ten guns. Now, I submit to Your Honors that the cops have the duty under the Fourth Amendment to do the right thing. Particularity is required here in mentioning what persons and places are to be searched. That does not happen. They then discover that there is family living on that first floor. They go past that, sit the aunt down, discover that this is the situation. They do not try to do anything after that to try to fix the warrant or be able to do what their duty is to make sure that this search is reasonable under the Fourth Amendment. Then they take it a step further and they go through every different room in the house. And under a whole bunch of different articles of clothing in the back of a room, find a chest. Now, that chest is described as not being the aunt and uncle's. So who does it then get – who then gets charged with that chest? Obviously, Titus Thompson. They should have taken the right steps before they searched that chest and found those guns. So, yes, they did find ten different firearms in the aunt and uncle's apartment, but still the Fourth Amendment analysis should apply. And that's why foundation matters. But they didn't distinguish between the upper and lower floors in the search warrant. They just named the address of the house, right? They did, Your Honor. So why would they not be allowed to search the lower half of the house, which they properly named? So in the search warrant, it's stated as two-family dwelling. But it does not describe or break up that there are actually two different apartments there with tenants living there. So if you get a search warrant on a motel, let's say, and there's 100 rooms that go across that motel, that doesn't allow for the police or officers to search every single room until they find what they want. Mr. Thompson owned the whole house, right? And he was the target of the search warrant, wasn't he? At this point in time, Mr. Thompson was the target, yes. And he was the owner of the house. He was the owner of the house, yes. For all we know, his aunt and uncle lived there as a condition of their rental to store the guns. Your Honor, that's speculation. I wasn't suggesting that anyone knew that. I was just suggesting that they would have a perfect right, it seems to me, to search both upper and lower if they had the address of the house. Not if there's different tenants living there. If there's different tenants living there, how do you get to have it both ways? You get to then just go into some—what if they were not relatives and they were regular paying tenants? They don't have a possessory interest in that house to not have a warrant specified with particularity? You know, we have case law that says if the warrant says the upper floor, you can't then search the lower floor. You know that case? Yes, I do, Your Honor, and I believe I cited to that in my first argument. Right. But when you just mentioned the house, I don't know why they're limited. Because of the particularity requirement and the components they're under. So when you look at this court's decision in U.S. v. Clark, 638 F3D 89, that's a 2011 decision out of this court. It breaks down totality of the circumstances. Always relevant, which is why I explained that morning's events. It also breaks down the components of the Fourth Amendment and being overly broad. And if a warrant is overly broad, then the rule should apply. When you find out that there are tenants who are actively there living there, you don't make assumptions. You fix the problem if you want to search that entire house. A couple of different factors here. This house is owned by a corporation. Mr. Thompson later on said that he owned the corporation which owned the house. There was no investigation that was done here to corroborate anything at all that Mr. Williams told them a couple of hours before. So in doing a diligent investigation, just spending a day to confirm or actually try to find out if you could corroborate anything that's said, that's what the Fourth Amendment protects. That's what the Fourth Amendment requires. And just because the officers did find guns in that apartment does not excuse their behavior that day. And if you look at any area of case law on any of these points way past this circuit, the Fourth Amendment is the Fourth Amendment. The Gates factors in their totality explain exactly what happened here. They form shopped around to the worst degree, maybe the best degree for them, but that's not what should happen. And fundamental fairness should not allow this to continue. And this case should be reviewed very carefully. And I thank you, Your Honors. And you've reserved one minute of rebuttal time. Thank you. Thank you. May I please support Monica Richards representing the United States of America, the FLE. Here we've had some discussion about the search warrant. We've had little discussion about the sufficiency evidence. I'd like to start with the sufficiency evidence just to say that what we had here was an investigation with witnesses who ended up becoming cooperators. We had co-defendants who testified. And taking that evidence in a light most favorable to the verdict, this court should affirm. With regard to the evidence of Mr. Cooper, Mr. Cooper's involvement in the conspiracy, we did have his house used at Munkle Avenue in Ashtabula, Ohio. There was a testimony of Orlando and Williams that they met Mr. Cooper's house with Mr. Cooper, that Mr. Cooper was present, that he provided drugs to not just Orlando but to other co-conspirators who were the straw purchasers in this case, that the straw purchasers became involved in the conspiracy because they were drug clients of Mr. Cooper's, and that's how they were paid was in the heroin that Mr. Cooper was dealing. So the testimony of Orlando alone is sufficient when you add in Mr. Williams' testimony. That just adds to it, of course. And Cooper, in fact, was the one who looped in Orlando. He asked her to drive Williams. There was a statement by my colleague that the plan was hatched between Williams and Orlando in the car. That's just simply not borne out by this record. Cooper asked her to drive Williams to the gun show and then asked if she had identification, all towards the goal of finding out whether or not she could buy guns at the location that they were heading to in her car. Cooper then gave her drugs for her participation in that and then also sent her to Buffalo with the guns in the car with Mr. Williams, paying her again with drugs and gave her gas money, too, for that trip. That happened on a couple of occasions according to Orlando, the testimony. So with regard to Mr. Williams, I'm sorry, with regard to Mr. Thompson, the evidence of Mr. Thompson's involvement in the conspiracy was overwhelming. The jury here was relied on that testimony of Orlando and Williams. Orlando herself saw Thompson. Williams testified to Thompson's involvement extensively. So then and then let alone the fact that in the end there were guns found in Mr. Thompson's house that were, in fact, purchased by the straw purchasers. With regard to the testimony or the question regarding covid and whether or not that was brought before the district court, it simply was not. In fact, there wasn't even a question as to whether or not he could talk with the jurors. I'd refer the court to the Thompson appendix at page 2754. In fact, my opponent, my colleague, excuse me, even went so far as to say it wasn't as though this was a quick verdict. This wasn't a rushed verdict here. I haven't talked with the jurors. There was no question. There was no indication that he was asking to speak with the jurors about anything, let alone certainly not covid. These jurors were, as your honor pointed out, jurors who were asking questions. They asked for readbacks. They asked for more. They asked for time for breaks. They weren't. There's no indication here. It's just pure speculation that there was any rush. If there's any questions about covid, I would then if there's no questions about that circumstance, I would just briefly address then the suppression testimony here. This was an abundance of abundance. We had not just I mean, I think this is the problem throughout here is that my colleague underestimates the import of the fact that the confidential informant was present before the issuing magistrate, Judge Mahalsky, and provided testimony. And Judge Mahalsky made his own independent and said so to the district court judge. When he was on the bench under oath, we had a sitting judge under oath in federal district court who testified to the fact that he did not rely on the statement, reliable confidential source that was in the affidavit. I don't deny it was in the affidavit, but I do I do cite this court to the testimony where Judge Mahalsky said I didn't rely on that. I used my own experience. I've done these things before. I looked at this witness. I got to hear this witness. I listened to what the ADA and what Detective Aquino, who was the applying officer, the applying law enforcement officer said. And I listened to all those things. I didn't just look at an affidavit and sign the warrant. With regard to. Unless there's no I guess I can unless there's no questions with regard to the warrant issue. I would rest on my brief. Thank you. May please the court relative to the rule. Twenty nine motion. I don't see how Mr. Cooper benefited from this, usually in a conspiracy. There's some sort of benefit, like someone paid him money to go get some sort of benefit for his alleged participation. And that is something that I would ask this court to consider the lack of any evidence of any benefit. We don't dispute that he was a drug dealer and the judge did issue cautionary instructions to the jury not to evaluate that in the context of firearms or guns. But in this case, there's nothing on the record to indicate that he benefited. And as far as the COVID argument, I think my client deserves the benefit of the doubt. And I think that this court should grant him a new trial so that he can have a fair trial and make sure that the jurors weren't influenced in any way. Thank you. Just briefly, Your Honor, on the point of overwhelming evidence against Mr. Thompson, I don't even think the district court referred to the evidence against Mr. Thompson as overwhelming. The indictment time frame was actually narrowed down at his sentencing to even or only encompass about a month or less than a month. You heard my colleague for the government argue about Ms. Orlando's testimony. I ask Your Honor to take a look at that and look at how weak that testimony is. She was a heavy, heavy heroin addict who admitted that at the time and essentially said that she saw Mr. Thompson twice. And that story changed. It went on articles of clothing. It went on whether or not he was wearing a certain type of baseball hat. And then all of a sudden the story changed to he was wearing the hat both times that she saw him. Then there was issues as to whether or not she actually heard his voice before. And then she was ultimately shown a picture of him and couldn't even identify Mr. Thompson. So the evidence specifically submitted by these particular witnesses was wholly, wholly contradicted, was incredible to say the least, and was ultimately used against these men to get a conviction. But it was not overwhelming with regards to Mr. Thompson. Now, with regards to going back real quick, if I may, to what the government keeps referring to, and they actually wrote this down in my notes, that we have misplaced emphasis on Williams' affidavit and that we don't take or address the fact that there was in-camera hearing. We actually do. Every single point of our argument here, we embrace that. And we go to explain how even though these steps were taken, there was boistering of this witness. His mere presence there, the fact that he had a suit on, the fact that he was continuing to be called a reliable, credible informant, all went to that day. That's not us not addressing it. That's us addressing it head on. This state judge was misled. There was abundance of omission of facts with regards to this individual, Mr. Williams, that should have been told to this judge, that would have been addressed if they went back to that other federal judge. I give a chronological breakdown in my brief about how the testimony went in that hearing from this judge and how he did not know specifically about prior dealings of Mr. Williams. He did not know the informant's history. There's a litany of questions that was asked to this honor. Were you aware this individual was the subject of a separate search warrant application to another judge in the federal system rather than your honor? That was not me who asked that question, but I would have asked it very similar. He said, I do not recall that. Were you aware that this individual was a convicted felon? I do not recall that. Were you aware that this individual was just the subject of a raid on this person's residence, just hours being brought before your honor? I do not recall that. All of this comes out in the testimony. So we embrace what happened that day. It's the agents misled this judge to believe they had an informant who was reliable and credible. And that means something in our system when you say that to a court. It's supposed to mean something. And here it did not, respectfully. And I thank your honors for your time. Thank you all. And we will take the matter under advisement. We're going to take another brief recess. Questions and recess? Thank you. Lord clerk, if you need a second for the last case, you can do so now. Right? Yeah. Oh, okay, okay. No problem. Thank you. Do you know who the perpetrators are? Yes. Perez, Conant are here. They're actually right now. So I'll be right there. Thank you. Judges of the United States Court of Appeals, for the second circuit. Good afternoon, everyone.